NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0302n.06

Case No. 07-3591

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

May 17, 2010

LEONARD GREEN, Clerk

| | |
|---|---|
| UNITED STATES of AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE SOUTHERN |
| WILMA KPOHANU, | ) DISTRICT OF OHIO |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

BEFORE:  BATCHELDER, Chief Judge; BOGGS and COOK, Circuit Judges.

**ALICE M. BATCHELDER, Chief Judge.**  Defendant Wilma Kpohanu appeals her conviction and sentence for health-care fraud and making false health-care statements.  We affirm.

**I.**

Wilma Kpohanu, a native Liberian, started a home health care business, Angel Health Care, Inc. (AHC), to serve the West African community in and around Columbus, Ohio.  She sought and obtained an Ohio Medicare/Medicaid provider certification, through which the Ohio Department of Health reimburses authorized home visits in the amounts of $55 for skilled ("nursing") and $24 for unskilled ("home health aide") visits.  This is an automatic reimbursement system, policed only by separate audits.

From October 2001 until May 2002, AHC submitted over 50,000 claims for skilled nursing visits, resulting in reimbursements in the amount of $2,920,775.  But AHC had doctors' orders (Form 485) for only $208,627 worth of visits, which means that AHC obtained $2,712,148 in

unsupported reimbursements. AHC had been claiming 400 visits per day (two visits per day for each of its 200 patients), seven days per week, despite having only 10 nurses on staff, some of whom never left the office. And AHC had been submitting claims on behalf of other (uncertified) providers, and keeping 10% of the reimbursement for itself.

In early 2002 a concerned AHC employee sent an anonymous email to the Ohio Attorney General's Medicaid Fraud Control Unit. The Attorney General ("AG") opened an investigation and began to interview potential witnesses, whereupon the number of claims submitted by AHC plummeted. When the Ohio Department of Health requested patient records for a review in late 2002, Kpohanu provided boxes of records that were later determined to be falsified (photo copies of nursing notes with forged signatures, photocopies of doctors' signatures cut-and-pasted onto fabricated orders, etc.)

In January 2003, the Ohio Department of Job & Family Services (DJFS) Surveillance and Utilization Review Section commenced a "full scope" audit and, noticing that all of the patients' photocopied handwritten records were identical but for the names and dates, referred the case to the AG. By August 2004, the AG and the U.S. Department of Health & Human Services were convinced of the illegality of AHC's activities, and arrived at AHC with subpoenas. As agents were collecting and reviewing medical records in one room, AHC employees were shredding records in another room. An employee reported this to the agents, who returned the next day and recovered numerous records (shredded and unshredded) from the dumpster outside the AHC offices.

A federal grand jury issued an indictment in December 2005 and a superceding indictment in June 2006, charging Kpohanu and AHC with one count of health-care fraud in violation of 18 U.S.C. § 1347, and two counts of making false health-care statements in violation of 18 U.S.C. §

1035.[1]  The government prosecuted Kpohanu and AHC as co-defendants but, in reality, Kpohanu directed all of the operations of AHC and was therefore responsible for the representations and misrepresentations of AHC with regard to benefits provided and billing.

The case proceeded to jury trial, where the prosecution argued that Kpohanu had directed a scheme to defraud Ohio Medicaid by (1) billing claims for fictitious nursing services,[2] (2) billing Medicaid for services actually rendered by other (uncertified) home-health-care agencies, and (3) ordering her employees to cover up the scheme by backfilling patient charts with fraudulent nursing notes and doctors' orders.  Ten former AHC employees testified for the government, and on cross-examination Kpohanu's attorney attempted to portray each of them as not credible.  Kpohanu testified that the government's witnesses had all lied.

Trial began on December 4, 2006, and lasted four days.  Kpohanu and AHC moved for acquittal at the close of the government's case and again at the close of trial.  The court denied the motion both times.  The jury convicted Kpohanu and AHC on all three counts.  The court ordered a PSR and had a sentencing hearing on April 18, 2007.  The court calculated Kpohanu's sentencing range as 97 to 121 months in prison, considered the § 3553 factors, and imposed a sentence of 97 months, three years supervised release, and $2,712,148 in restitution.  Kpohanu appealed, raising numerous issues for review.  The court sentenced AHC to three years probation and $2,712,148 in restitution, and ordered it to "authorize an individual to complete unfinished corporation business while Wilma Kpohanu is incarcerated."  AHC filed a notice of appeal, which was consolidated with

_____

[1]A co-defendant, Manjula Sankarappa, entered a guilty plea to obstructing justice (for shredding the documents).

[2]Throughout her brief to this court, Kponahu argues from the premise that this is a case about "up-coding" — charging for a higher code or level of care (skilled nursing) than was actually provided (unskilled care).  The government, however, emphasizes that this is not about up-coding, but rather about defendants' billing for services never rendered.

the present appeal, but on November 5, 2007, we dismissed the appeal for want of prosecution. Consequently, this opinion concerns only the issues raised by defendant Kpohanu.

## II.

Kpohanu's first claim on appeal is that the trial court erred by refusing her motion for acquittal on the basis that the prosecution had produced insufficient evidence to support a conviction. "When a defendant challenges his [or her] criminal conviction on the basis of insufficient evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In assessing the sufficiency of the evidence, we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *Id*. (quotation marks omitted).

### A.

Kpohanu asserts that the government did not provide evidence of a jurisdictional element of the offense, namely, that the Ohio Medicaid program affects interstate commerce. She further argues that the government is attempting to have this court take judicial notice of the interstate commerce element, and she cites *United States v. Jones*, 580 F.2d 219 (6th Cir. 1978), for the proposition that courts cannot take judicial notice of jurisdictional elements. The government responds that it produced testimony at trial that the federal government funds 60% of Ohio's Medicaid program, which is sufficient to demonstrate an effect on interstate commerce. The government also explains that the effect need not be substantial, as Kpohanu had suggested.

4

In *Jones*, the government failed to offer evidence of any nexus to interstate communication (as was required by the criminal statute at issue), arguing instead that the necessary fact (i.e., that the associated telephone company engaged in interstate communication) was either (1) common knowledge, or (2) the proper subject of judicial notice. *Id*. at 222. The *Jones* court held: (1) that it was not common knowledge, *id*. at 223; and (2) that judicial notice was not available on appeal because, in a criminal case, even judicially noticed facts must be decided by a jury, *id*. at 224.

This case is not like *Jones*. The statutes under which Kpohanu was charged are covered by 18 U.S.C. § 24, which defines "health care benefit program" as meaning "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." The federal government introduced at trial testimony that federal government funds 60% of the Ohio Medicaid program. Kpohanu does not claim that Ohio Medicaid does not affect commerce; she claims only that the government failed to demonstrate that Ohio Medicaid affects <u>interstate</u> commerce. Clearly, the government's evidence is sufficient to prove that it does. Consequently, *Jones* is inapposite and this claim is meritless.

**B.**

In count two of the indictment, the government charged Kpohanu with making (or aiding and abetting in the making of) false statements in a specific Medicare claim, that of patient "S.Y." And in count three, the government charged Kpohanu with false statements in the medical claim of patient "F.F." Kpohanu argues that the government did not produce evidence that Kpohanu lied with regard to *these particular defendants* and that proof of her general involvement was not enough.

5

The government contends that it presented sufficient evidence, to wit: (1) an Ohio DJFS agent testified that Ohio Medicaid paid the claim submitted by Kpohanu for patient S.Y.; (2) the doctor whose name/signature was on the order for S.Y. testified that he had never ordered the care depicted and that his signature had been falsified; and (3) AHC employees testified that Kpohanu had ordered them to submit false bills and falsify the doctor orders, and had done so herself.

"The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *Jackson*, 55 F.3d at 1225. Here, the direct evidence demonstrates that Kpohanu falsified (or ordered subordinates to falsify) the claims AHC submitted to Ohio Medicaid for payment; S.Y.'s medical record was falsified; and AHC submitted S.Y.'s claim for payment. The inference from this, and the sufficient circumstantial evidence, is that Kpohanu submitted S.Y.'s falsified claim.

A similar analysis applies to the charge for the medical claim of the patient F.F. The evidence presented by the government demonstrated that AHC submitted the claim; that it was paid by Ohio Medicaid; that F.F. had not been a patient of AHC, but of Universal; that Kpohanu had directed the practice of billing for patients of unauthorized providers; and that Kpohanu knew that this practice was illegal. The claims of insufficient evidence to support conviction on counts two and three are without merit.

### III.

Kpohanu claims in this appeal — but did not raise this issue before the district court — that the trial court erred by allowing the government to proceed against her on a legally inadequate theory of a crime. Generally, this court will review an error to which no objection was made only if it

6

constitutes "plain error" that affects the substantial rights of a party. *See United States v. Olano*, 507 U.S. 725, 731-36 (1993); Fed. R. Crim. P. 52(b).

Kpohanu contends that the government's theory of "d/b/a billing fraud", i.e., submitting reimbursement claims for work done by other, uncertified providers, was inadequate as a matter of law because the government never established that this d/b/a billing was illegal, inasmuch as the government never identified or introduced the state law or regulation that AHC had violated. *See* Appellant's Reply Br. at 11 ("Even at this stage of the proceedings, the government is unable to identify the state Medicaid regulations which AHC supposedly violated.").[3] Kpohanu's defense was that she honestly believed that she could submit claims to Medicaid on behalf of those other (uncertified) companies, so long as she called them "d/b/a", and the government never proved that she could not.

The government responds by pointing out that this was never raised at trial — it was accepted at trial that every individually incorporated provider must have a unique provider number; providers can get a provider number only through certification; and only certified providers with provider numbers may submit claims. And, the government explains, this is not contested because this not a case about a state law violation, this is purely a case about fraud: that is, AHC (Kpohanu) submitted claims for reimbursement, claiming them as its own, whereas the work had actually been performed by other (uncertified) providers. This is the misrepresentation, this is the fraud, regardless of whether that conduct is illegal under state law. Finally, the government points out, this "d/b/a

---

[3]It is perhaps noteworthy that Kpohanu never argues that her practices *were or are legal* or that no such regulation exists; she simply argues that the government never expressly identified or articulated the regulation which she would have violated.

7

billing fraud" was just one of the three types of fraud for which Kpohanu was charged and convicted, so even if this theory was legally insufficient, it would not upset the entire conviction.

The record amply demonstrates that Kpohanu made — and caused AHC to make — materially false statements "in connection with the delivery of or payment for health care . . . services" as proscribed by 18 U.S.C. § 1035. We find no plain error here.

**IV.**

Kpohanu argues that while conducting the trial the district court committed several errors concerning witness testimony, attorney conduct, and jury instructions. We address each in turn.

**A.**

Kpohanu contends that the trial court erred by limiting her cross-examination of government witnesses. We review the district court's evidentiary decisions for an abuse of discretion. *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004). If defense counsel did not object at trial, we review for plain error. *United States v. Lopez-Medina*, 461 F.3d 724, 746 (6th Cir. 2006).

Kpohanu's attorney sought to question two government witnesses (former AHC employees) about certain exculpatory statements that Kpohanu had made to each of them during telephone conversations that occurred after she had been indicted. The government objected on the basis of hearsay and the court sustained the objection. Kpohanu claims that the court's ruling abridged her right to confront the witnesses against her because the statement would have helped her, and therefore, the court abused its discretion. Further, she claims that the government opened the door to this questioning.

The government concedes on appeal that these statements may not have been hearsay, insofar as they may have been offered as evidence of Kpohanu's state of mind at the time, rather than for

the truth of the matter asserted in those statements. But, the government explains, Kpohanu's attorney did not make a record of the sidebar discussion or a proffer of the purpose for those statements' introduction. Moreover, the stricken statements were cumulative of statements that had already been admitted. And Kpohanu testified herself and could have clarified her part of those conversations, but did not do so. Finally, to the extent that the purpose of the questioning was to determine if Kpohanu had spoken to her former employees in a threatening manner, those employees did testify that they had <u>not</u> been frightened based on what Kpohanu had said during the calls.

We cannot conclude that the court abused its discretion by excluding these statements.

**B.**

Kpohanu contends that the trial court erred by allowing the prosecutor to make an improper comment to the jury during his closing argument, and that the making of this comment was prosecutorial misconduct. Typically, prosecutorial misconduct is a mixed question of law and fact, reviewed *de novo*. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). But when a defendant fails to object, our review is for plain error. *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006).

During his closing argument, the prosecutor told the jury that Kpohanu had written a "check for $125,000 to her boyfriend," and had a "house with a pool in the middle of it." Kpohanu's attorney did not object at the time. On appeal, Kpohanu's attorney claims that the prosecutor's statements were an improper appeal to class prejudice, plainly designed to inflame the passions of the jurors, and that these allegations were not supported by the evidence presented at trial.

The government explains that these statements were supported by the evidence. While no witness may have used the word "boyfriend," a witness had testified — without challenge — that

9

Kpohanu had given the money to a man with whom she "had an intimate relationship." And one of Kpohanu's witnesses had used the specific phrase "a house with a pool in the middle of it." Moreover, the government explains, these statements were made on rebuttal closing, in response to defense counsel's closing, in which he pressed the question: If she stole all this money, then where did it go? Based on defense counsel's closing, the government was virtually obligated to explain where all the money went. This comment by the prosecutor was not an appeal to class prejudice, and we find no plain error.

## C.

Kpohanu contends that the trial court erred by allowing lay witnesses to present expert testimony. When the defendant fails to object at trial, this court reviews for plain error claims of improper admission of expert testimony. *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007).

A former employee testified that, in her opinion, the "d/b/a relationship" that Kpohanu relied on in submitting the other providers' claims had "no valid legal basis." Another employee testified that the regulation requires separately incorporated providers to submit reimbursement claims under their own provider numbers. These two witnesses were not experts in Ohio Medicaid law and certainly were not qualified as experts. Kpohanu argues that the trial court erred by allowing this testimony because lay witnesses may not testify as to their opinions regarding how the law applies to the facts of the case. *See United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984).

The government first points out that Kpohanu's attorney did not object to this testimony during trial, so this is a question of plain error. And, the government explains, these witnesses were not testifying as to what the law actually was or how the law applied in this case. Rather, they

testified that they had concerns about Kpohanu's conduct, the basis for which was their belief that her conduct was illegal, at least as they understood the Medicaid regulations. Moreover, the most relevant portion of their testimony was that they raised these concerns (and their basis for them) directly to Kpohanu, thus providing lay testimony that she had been alerted to these concerns.

We simply cannot conclude that there was any plain error here.

**D.**

Kpohanu claims that the trial court erred by failing to give a cautionary instruction to the jury regarding "expert testimony" by lay witnesses, but Kpohanu's lawyer neither objected during trial nor asked the court for any such instruction. Thus, Kpohanu is really arguing that the court was obligated to give the instruction *sua sponte*. Kpohanu relies on *Lopez-Medina*, 461 F.3d at 743.

In *Lopez-Medina*, this court held "that permitting *police officers* to testify as experts in their own investigations and give opinion testimony on the significance of evidence they have collected, absent any cautionary instruction, threatens the fairness, integrity, and public reputation of judicial proceedings." *Id*. at 745 (emphasis added). The reasoning behind this holding focused on "possible law enforcement bias" and the "particular concerns that may arise when [a police] officer gives expert opinion testimony." *Id*. at 744. *Lopez-Medina* is not so broad as Kpohanu suggests.

The two witnesses in this case were not police officers, they were former employees of AHC, and there is no former-health-care-worker bias comparable to the law-enforcement bias considered in *Lopez-Medina*. These two witnesses were not offered as experts, qualified as experts, or questioned as if they were experts. They simply testified that they believed AHC was engaged in illegal activity, the basis for that belief, and, most importantly, that they alerted Kpohanu to the possibility that AHC was engaged in illegal activity.

11

This claim lacks merit.

**E.**

Kpohanu contends that the trial court erred by failing to instruct the jury properly on the state law. Typically, this court reviews the district court's instructions to the jury for an abuse of discretion. *United States v. Stover*, 474 F.3d 904, 913 (6th Cir. 2007). But, again, when defense counsel fails to object to the trial court this court will review for only plain error. *Id*.

Kpohanu contends that the trial court erred by failing to instruct the jury properly on the relationship between the state Medicaid regulations and the fraud charge. Specifically, the court did not identify or explain the Medicaid billing regulations at issue. The government counters by explaining that none of the crimes for which Kpohanu was indicted and convicted depended on proving a violation of state law; it was only necessary to prove that she engaged in a fraudulent scheme.

We agree with the government, and we cannot find any plain error here. In fact, if such an instruction had been requested, the court might reasonably have declined to give it.

**F.**

Kpohanu claims the trial court erred by giving a "deliberate ignorance" jury instruction. This court reviews jury instructions for an abuse of discretion, *Stover*, 474 F.3d at 913, and the question is "whether the charge taken as a whole, fairly and adequately submits the issues and applicable law to the jury," *United States v. Lee*, 991 F.2d 343, 350-51 (6th Cir. 1993). A "deliberate ignorance" instruction is proper so long as there is some evidence of deliberate ignorance. *Id*.

Kpohanu argues that the district court erred by giving the "deliberate ignorance" instruction because: (1) this instruction fooled the jury into convicting her just because her view of the

Medicaid law was different from her employees' view; and (2) the instruction was worded improperly.

The government explains that there was evidence of Kpohanu's deliberate ignorance; in fact, her entire theory of defense with regard to the d/b/a billing fraud was one of ignorance. She claimed that she (mistakenly) understood a letter from Ohio DHS as authorizing the d/b/a billing. But her employees testified that they had no such misconception; they knew that the Ohio DHS letter did not authorize the d/b/a billing in the manner that Kpohanu suggested; and they had told Kpohanu, on more than one occasion, that the letter said no such thing. But, they testified, Kpohanu always responded with a claim that she did not understand them. This, the prosecution argued and the district court found, was evidence of deliberate ignorance.

There was "some evidence" of deliberate ignorance introduced at trial and the district court did not abuse its discretion by giving this instruction. This claim lacks merit.

**G.**

Kpohanu contends that the trial court erred by committing or allowing cumulative errors. "[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Blackwell*, 459 F.3d 739, 770 (6th Cir. 2006) (quotation marks and citations omitted). That is, when errors are acknowledged but deemed harmless, it may be that the cumulative impact of those errors is not harmless. *See United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993) ("Taken in isolation, these errors may be considered harmless," but "[a]fter examining them together, . . . we are left with the distinct impression that the due process [sic] was not satisfied in this case.").

Kpohanu contends that the aggregate effect of her numerous alleged errors renders her trial fundamentally unfair. The problem with this contention is that she has not proven, and this court has certainly not found, any errors. This is not a case where errors were accepted as harmless, such that their prejudice could now be considered in the aggregate. This is a cases in which there were no demonstrable errors. Without error, there is nothing to aggregate.

## V.

Kpohanu asserts that the trial court imposed an unreasonable sentence, a claim we review for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). That is, the reviewing court "must first ensure that the district court committed no significant procedural error," and after determining that the sentence is procedurally sound, the reviewing court then considers substantive reasonableness. *Id.*

Kpohanu first argues that the advisory range was incorrect because the court miscalculated the amount of loss. The court calculated $2.7 million in loss (corresponding to an 18-level increase) by assuming AHC was actually entitled to one unskilled visit per patient per week, calculating the reimbursement value for that number of visits, and subtracting that from the value actually paid. Kpohanu argues that, in up-coding cases, the amount of loss is the difference between the amount actually paid and the amount to which the provider was entitled, which she claims was far more than one unskilled visit per patient per week. She argues that there was testimony that some visits were provided.

The government responds that: (1) this was not raised to the district court; (2) this is not an up-coding case — Kpohanu billed the maximum and provided no services at all; and (3) the evidence does not support her contention that AHC provided some unskilled services. Moreover,

14

as we will address again in the next section, the reason that Kpohanu cannot prove that she provided any services is because she so thoroughly tampered with the AHC records that they are unreliable. Based on the nature of the evidence and Kpohanu's culpability in tarnishing the evidence, there is no basis for a finding of plain error or abuse of discretion in the district court's sentencing determination.

Next, Kpohanu argues that the district court abused its discretion by imposing the "abuse of position of trust" enhancement because that enhancement relies on a particular relationship with the victim, whereas here, there was no such relationship between Kpohanu and Medicaid, but only a formal licensing agreement. The government responds that, by becoming a certified provider, Kpohanu put herself in a position of trust with the Ohio DJFS (which lacked an independent review mechanism and relied on the integrity of its certified providers). Additionally, her position of complete authority at AHC enabled her to commit the offense and to conceal it for as long as she did. This explanation appears to us to be sufficiently reasonable to overcome a claim of abuse of discretion or plain error.

Finally, Kpohanu argues that the district court abused its discretion by refusing to grant her a downward variance, citing the statement made by the district court in the course of its § 3553 findings that a lengthy prison sentence was not necessary in this case. This, she contends, demonstrates that her sentence is substantively unreasonable.

Sentences imposed within a properly-calculated Guidelines range enjoy a rebuttable presumption of substantive reasonableness on appeal. *United States v. Vonner*, 516 F.3d 382, 389-90 (6th Cir. 2008) (en banc) (relying on *Rita v. United States*, 551 U.S. 338, 347 (2007)). In this case, the district court sentenced Kpohanu to 97 months, the bottom of her 97-to-121-month advisory

range. And the better reading of the court's statement, particularly in light of the court's other statement during the sentencing proceedings to the effect that this was a serious offense deserving of serious punishment, is that the court accomplished its objective of minimizing the sentence by sentencing her to the bottom end of the range. Kpohanu's argument is not enough to rebut the presumption.

## VI.

Kpohanu asserts that the trial court imposed restitution in an improper amount. We review the amount of a restitution award for an abuse of discretion. *United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009). Kpohanu did raise an objection to the district court.

Kpohanu claims that the district court, in calculating the amount of restitution, should have established the number of home visits actually authorized and performed at 13 per week rather than one per week.[4] The government replies that, whereas it proved that she billed for services that were not provided, she never once proved an incident in which she provided a service that was not billed. There is no evidence that she provided any services whatsoever, so the use of one visit per patient per week in the estimate was simply a gesture to give her some benefit of the doubt. Moreover, the reason that she could not prove that she in fact provided any services is that she tampered with all of her records by backfilling fraudulent and fabricated nurses' notes and doctors' orders.

There is no basis upon which we could find an abuse of discretion in the district court's calculation of restitution. This claim lacks merit.

## VII.

---

[4]In her brief, she states that there was an exhibit presented to the grand jury that would support this argument, but that the exhibit was not given to the court or retained by counsel. If she mentions this in order to emphasize the fact that she has no evidence whatsoever to support her current claim, then it is effective (albeit counterproductive).

For all of the foregoing reasons, we **AFFIRM** the conviction and sentence.